Bland, Chancellor.
This case standing ready for hearing, and the counsel on both sides having been fully . heard, the proceedings were read and considered.
It will be proper to recollect as we proceed with the exposition of this case, that this is a bill professedly for relief against these defendants, as the alleged unjust holders of certain specified assets of the plaintiff’s intestate; and that therefore, if the plaintiff is entitled to relief of any kind, according to the nature of his case, he is, as a consequence of such right, entitled to an account from the defendants, of the rents and profits of the properly so wrongfully held by them, and to a discovery from each as to all matters in relation to such an account. The plaintiff’s title to relief is obviously and necessarily the first and preliminary question to be decided; for it would be idle to go into any account of rents and profits, or to ask for or to consider any discovery so made, if the plaintiff is not entitled to relief in some one form or other, accord *562 ing to the nature of his case; since no case can be sent to the auditor with directions to state an account in any way, unless it be first shewn, that the plaintiff is entitled to relief; nor can an account or discovery be directed in any case but as ancillary to a previously ascertained or admitted right to relief. So that, if upon a demurrer, plea, or answer, before or at the final hearing it should be determined, that the plaintiff can have no relief, he can have no account, nor any discovery; and although thé taking of the account may not be stayed .pending an appeal from the adjudication in favour of the plaintiff’s title. (a)
I shall therefore in the first place, endeavour to obtain a clear view of the plaintiff’s case; and thereupon consider and determine the nature of the relief to which he is entitled; and then give directions as to the accounts necessary to be taken for the purpose of ascertaining the extent of that relief.
According to the law of England, an administrator de bonis non cannot call the representatives of the previous deceased administrator of his testator to account for any property of the intestate, that such predecessor may have converted or wasted. Nor can he claim or recover any thing but those goods, chattels, and credits of his intestate, which remain in specie and are capable of being clearly and distinctly designated and distinguished as the property of his intestate. (b) An executor or administrator, who is here considered as a trustee for the creditors, legatees, and next of kin, is expected and required-to preserve the property of the deceased apart from his own, and to give it, as it were, an ear-mark, that it may be known and readily traced to any one into whose hands it may happen to fall. And if he does so, the court will do every thing that can be done to protect and assist him. (c)
According to our Provincial testamentary system, an administrator de bonis non might, under certain circumstances, have had *563 liis predecessor cited before the commissary and compelled to account. (d) But at present, the remedy against an administrator or his representatives, for any -waste or misapplication of the effects of the deceased, is by an action at law upon his administration bond by any one interested. For it is expressly declared, that the authority conferred by letters of administration de bonis non, shall he to administer all things described in the acts as assets not converted into money and not distributed, or delivered, or retained by the former executor or administrator, under the direction of the Orphans Court. (e)
Hence this plaintiff is incompetent to demand, in the representative character in which he sues, any thing but those goods, chattels, and credits, which his letters authorize him to administer; that is, the chattels real and personal property of his intestate, which may be now shewn to remain undisposed of by either of the previous administrators, John or Mary; or which have been and continue to be hold unaccounted for by any one as trustee or agent of the late Anthony Hook, his intestate. The statements and allegations of these original and amended bills must, therefore, be taken subject to the limited rights of the representative character ©f this plaintiff.
It appears that some of the next of kin of the late Anthony Hook, under an impression, that the chattels real of the deceased, had vested absolutely in them, have disposed of, or attempted to make a final disposition of the whole, as if such chattels real had been immediately cast into their bands by the mere operation of law, in like manner as the real estate of an intestate is at once cast upon his heirs. If these next of kin acquired, at once, by the act of the law alone, a legal right to these chattels real, by virtue of W'hich they might, either concurrently with or independently of the administrator, dispose of them; then, as the joint or independent holders of the property in controversy, they ought to have been made parties to this suit. And, if they have acquired such a legal right, and have actually disposed of these chattels, then, it is no less evident, that all claim against these defendants is, so far, entirely at an end. In these points of view the allegations of the bill, in relation to these next of kin of the intestate, present some important preliminary inquiries.
*564 The real estate of an intestate devolves at once and entirely upon his heirs by the mere operation of law. But his personal property is, by the law itself, cast upon no one; nor does the legal ownership of it vest immediately in any person. Such a legal title can only vest in an administrator, who alone is considered as the legal representative of the intestate as to his chattels real and personal estate. In the interval between the death of the intestate and the granting of administration, the legal right to the personal property is in the keeping of the law. During that interval there is no one who can sue or be sued for it; so that a person who had, after the death of the intestate, obtained possession of his personal property, could not have it quieted or matured into a right by the lapse of any length of time, even as much as forty years uninterrupted possession, before the granting of letters of administration; because, the statute of limitations could not be allowed to operate at all until the legal title was vested in some one; and there was a person lawfully clothed with a capacity to sue for, hold and dispose of such property. (f)
Our statute of distributions, like that of England, (g) directs the goods, chattels, and credits of those who die intestate, to he committed to an administrator whose powers and duties are prescribed. He has a vested interest in the personal estate of the deceased, (h) and is directed to collect and take the whole of it into his possession ; which, or the proceeds of the sales thereof, he is, in the first place, to apply- to the satisfaction of all the debts due from the intestate ; and then, he is to distribute the surplus among the next of kin of the deceased. Although the creditors of the deceased are to be first provided for under this statute, yet the next of kin, among whom the surplus is to be distributed, take an interest which vests in them, by operation of law immediately. It is considered as a species of chose in action of an indefinite value; in nature of a present debt, payable at a future day. (i) This interest vests in those who are the next of kin of the deceased at the time of his death; not, however, in exclusion of a posthumous *565 child, who is regarded as a then living, though unborn distributee. And therefore, should a distributee die before the distribution of the surplus is actually made, his share will not sink into the estate of the intestate; but go to bis own legal representatives in like manner as his other personal property. (j)
Hence it is clear, that, in no ease can a next of kin make title to a distributive share otherwise than through an administrator; who, in equity, is regarded as a trustee for the creditors and next of kin ; and as such may, in Chancery, be called to account by all or any of them, (k) And every one who takes possession of the personal property of an intestate, after his decease, may be sued at law or in equity by a creditor as an executor de son tori, and charged accordingly. (l) And, in equity, he will be considered as a trustee, and held accountable to the administrator, no matter how long he may have had possession before the administration was granted. (m)
It has been declared, that many widows or others, having the deceased’s effects in their hands, and right to the administration thereof, designedly suffer other persons to administer, whose mouths are easily stopped with part of the estate’s being delivered them, and bring only such part of the appraisement, to the great dishonour of the deceased, and deceit of the living ; for prevention whereof as well as of frequent tedious suits for the detecting such concealments, it was enacted, that the court might in a summary way, cite such persons before it and examine and decide on the matter, (n) Here the distributees having a right to the administration are specially designated, and it is expressly declared, that they shall not retain or hold any of the personal estate of the deceased ; and if they do conceal any of it, they are made liable in a summary way, as wrong-doers.
If the law were otherwise; and if each creditor and every one next of kin were allowed to help himself to what he thought his due; to seize upon and in any manner by his own act alone acquire a legal right to the personal property of an intestate, the greatest confusion would ensue, and the most monstrous frauds might be perpetrated. No letters of administration would be taken out in any case; but, on the death of every one who had left any *566 personal estate, worth c ontending for, a disorderly scramble would take place; and those resident at a distance, infants, and all others who were unable to take care of their own interests, would be openly and wantonly defrauded, cto the great dishonour of the dead and deceit of the living.’ Such a course could not be tolerated in any shape, or for an instant. (o)
Hence the indispensable necessity, in all cases, of a regular administration; and of compelling all, as well creditors as next of kin, to resort, for the payment of their claims and distributive portions, to an administrator. It is not pretended, that these next of kin of Anthony Hook obtained any thing, any right whatever from his administrators. Consequently, having derived no right from either of the administrators; and none having been cast upon them by mere operation of law, they never had the power, in any manner, legally to dispose of any of the personal estate of the deceased, or to do any act which could at all affect the right of the present plaintiff.
Leave was asked and obtained, on the 7th of February, 1823, to make James Hook, the son of the late John Hook, a defendant; who on the same day filed his answer to the amended bill. And in a kind of amended or duplicate bill, filed on the 23d of July, 1824, James Hook is once incidentally spoken of as a defendant; no process was ever prayed against him by either bill; but by an agreement, filed on the 4th of November, 1826, he is admitted to be a party defendant. This person is no otherwise noticed in the proceedings. No charge whatever has been made against him; nor does it appear, that he can in any degree be made liable for any part of the subject in controversy, either in his individual capacity or as heir or next of kin of his father the late John Hook, or of his grandfather the late Anthony Hook. The presence of this defendant James Hook, appears to be in no way necessary; and therefore I shall for the present take no further notice of him.
The bills, through a portion of them, seem to consider the next of kin, or as it calls them, the heirs of the late Anthony Hook, to be parties to this suit. But they have neither been made plaintiffs nor defendants as such; and therefore, all that has been said or proved about them and their agreements must be rejected as mere surplusage. William McMechen, a defendant, says he answers ‘the bill of complaint of James JYeale and others represen *567 tatives of Anthony Hook, deceasedand, in the body of his answer he says, ‘during all which time several of the complainants resided in the neighbourhood of the land.’ And others of the defendants seem to have an eye to some other complainant besides JYeale. These respondents appear, in this respect, to have turned their attention to some of the irrelevant circumstances stated in the bill, without sufficiently regarding its substance. But all such expressions and allusions in the answers must in like manner, he rejected as surplusage.
So much as to the excrescences, the foreign matter and mere careless verbiage of the bill and some of the answers. But before we proceed to consider the merits of the case it will be necessary to ascertain from these pleadings, as accurately as practicable, what is the matter in issue; and what part of the allegations of each has been admitted, taken for true, or is to be sustained or combated by proof. In relation to these matters it will be necessary to explain, recollect and apply some of the general rules in relation to answers.
The Jirst of these general rules, which have a bearing upon this case, is, that where the general replication is put in, and the parties proceed to a hearing, all the allegations of the answer, which are responsive to the bill, shall be taken for true; unless they are disproved by two witnesses, or by one witness with pregnant circumstances. The answer to this extent is considered as evidence, and conclusive unless disproved, even although the defendant may have a direct and palpable interest in establishing the truth of what he advances, (p) An answer is only so far responsive as it answers to a material statement or charge in the bill as to which a disclosure is sought; and which is the subject of parol proof, but no further. Where a deed, or instrument of writing is necessary to establish any right, and the bill requires the evidence of such right, the answer, unaccompanied and unsupported by such deed or writing, will be no evidence although it should directly respond to the bill; because the answer is only in the nature of parol evidence; and, in such case evidence of a higher grade is required by law. (q)
But where the bill asks for the production of evidence, which from the nature of the plaintiff’s case, he has a right to claim; *568 that may be necessary and useful to him in other cases, besides the one then under consideration, an answer to such a bill is not ■responsive which merely asserts the fact without saying anything of the evidence, of its existence, or the means of obtaining it. And where a defendant, by his answer, asserts a right affirmatively, in opposition to the plaintiff’s demand, the defendant must establish it by proof, or the assertion will be disregarded ; for a defendant cannot be permitted to swear himself into a title to the plaintiff’s estate, (r) But where an administrator is called upon to answer certain matters which appear to have rested exclusively within the knowledge of his intestate, it will be sufficient, that he swears as he is informed and believes ; (s) but such an answer is to be taken with reference to the reasons given for his belief; for if the reasons are futile, and especially if the alleged belief be in a high degree irreconcilable with the admitted or established circumstances of the case, the answer cannot be credited, nor be allowed thus loosely to swear awTay the equity of the bill. (t)
A second general rule is, that every allegation of the answer which is not directly responsive to the bill, but sets forth matter in avoidance or in bar of the plaintiff’s claim is denied by the general replication, and must be fully proved or it will have no effect.
A third general rule is, that if the defendant submits to answer at all, he must answer fully and particularly; not merely limiting his responses to the interrogatories of the bill; but respond to the whole and every substantial part of the plaintiff’s case. He is not, however, bound to go further, and to answer any interrogatory asking a disclosure of matter no way connected with or material to the case. If the answer be in any respect evasive or insufficient, the plaintiff may except to it; and thus extract from his opponent a full and perfect answer. (u)
But to this general rule there is a modification, the nature and bearing of which may be sufficiently illustrated by one or two *569 instances. A defendant, to a bill of discovery, answered a portion of it, and as to all the other matters therein set forth, he answered and said, that he had no other knowledge of them than what he had obtained confidentially as counsel; and, therefore, declined answering further; this answer was deemed sufficient. And, again, a defendant answered as to part, and as to the residue relied upon the statute of limitations; this answer also was held to be sufficient. In such cases, a part of the answer performs the office of a plea ; and the defendant thus makes defence to the whole case by a disclosure of all the facts so far as he is bound so to respond; and for the residue, by presenting such an equitable bar to the plaintiff’s claim as is a sufficient excuse for not answering in the manner required by the bill. The exact compass of this modification of the rule, that if a defendant submits to answer at all, he must answer fully, remains yet to he adjusted, Much has been said upon the subject; but, as the cases in relation to this ‘distracted point,’ as it lias been called, have no bearing upon the case now under consideration, they have been thus generally noticed merely to prevent misapprehension. (w)
A fourth general rule, is one which grows out of the third rule, that exacts a full answer; and requires to be attentively considered in this case; it is, that where the defendant fails to answer any part of the material allegations of the bill, such unanswered allegations shall, at the hearing, he taken to he true. Thus, where the bill demands the delivery of two pieces of property, and the answer makes defence as to one, but is totally silent as to the other. In such case, according to this rule, the bill may he taken pro corfesso for that as to which the answer is silent; and the plaintiff may obtain a decree accordingly. (x)
The propriety of this rule has, however, been questioned; and, therefore, it stands in need of all the support it can derive from authority, reason and analogy.
If, upon exceptions, the answer is held to be insufficient, the defendant will he ordered to answer more fully; and if he fails to do so, in England, sequestration will go against his estate. The plaintiff need not, however, stop there, but may proceed to have his whole bill taken pro confesso; for the court is in the habit of *570 considering an insufficient answer as no answer, (y) In this state, obedience to an order directing a more perfect answer, upon exceptions being sustained, is usually enforced by attachment; but, as in England, on the defendant’s failing to answer as ordered, and the process of attachment failing to coerce an answer, as required, the whole bill may be taken pro confesso. (z) So where the defendant had answered, and the plaintiff then amends his bill, introducing new matter, he is entitled to an answer to such new matter; because, an amended bill is a part of the original bill, and the defendant’s answer thereto is a part of his original answer; and, consequently, the defendant is as much bound to answer the amended bill as to answer each portion of the original bill itself. Therefore if he fails to do so, the plaintiff may proceed, according to the course of the court, and have his whole bill taken pro confesso. (a) For, as it has been said, .if the plaintiff should not be entitled to such a decree under those circumstances, then the authority of this court would be very defective, and the justice of it might be eluded. (b)
A plea is a special answer to a bill, differing in this from an answer in the common form, as it demands the judgment of the court, in the first instance, whether the special matter urged by it does not debar the plaintiff from his title to that answer which the bill requires. But where, from the matters set forth in the bill, an answer is required to support a plea, it will be overruled without such an answer; upon the ground, that the matters not thus answered are taken for true. As where the bill sets out a claim arising on a mortgage made more than twenty years before the institution of the suit, and then goes on to shew, that there has been such partial payments, or recent acknowledgments as would take the case out of the statute of limitations, were it pleaded. In such case a plea of the statute of limitations must be supported by an answer denying such partial payments and recent acknowledgments ; for, otherwise, those circumstances, not being denied by the plea, would be taken for true, if not denied by way of answer, and would shew, that the case had been taken out of the statute. (c)
*571 These authorities appear satisfactorily to sustain this rule; and to shew, that the defendant cannot be allowed, with impunity or advantage to himself, to refuse to answer at all; or in any manner or form to stop short, or to omit to answer any material part of the plaintiff’s case ; and that the consequence of such refusal or failure is, that the whole bill, or so much of it as remains unanswered, may, at the hearing, be taken pro confesso. (d)
The proceedings in Chancery have been formed according to the course of the civil law, in some respects, and analogous to the common law in others; and as to all matters of substance there must be the same strictness in pleading in equity as at law. (e) Hence it is not unfrcquent, where a case arises as to which former decisions furnish no safe guide, to have recourse to the illustrative analogies of the common lawr. (f) Supposing then, that, in relation to this subject, there was a total absence of all manner of precedent and authority, the analogous course of the common law would be found to afford much and strong light.
At common law there are two defaults, the one before, and the other after appearance. The consequence of the first, in England, is, that the defendant may be outlawed; and in this state, in many cases, is, that an attachment may go against his estate. The consequence of the second default, or the defendant’s not putting in any plea at all, is, that the plaintiff may have a judgment by nil dicit. The plea is called, at common law, the answer of the defendant; and if he fails to answer, judgment is awarded against him on the ground, that he has thus tacitly admitted, or confessed the case of the plaintiff; and left him nothing to litigate or to prove. So, in equity, after an appearance, the taking a hill pro confesso where no answer has been put in; or no sufficient answer, after exceptions have been sustained, is analogous to the taking the declaration for true, where the defendant has put in no plea at all, or it has been held insufficient on demurrer. (g)
It is a rule, at common law, that every plea must answer the whole declaration, or at least every material part of it, which goes to constitute the gist of the action. But, the defendant may fail, or purposely decline to plead, or answer to every part of the decla *572 ration; in which case, the plaintiff may join issue on the plea and take judgment for the unanswered part as by nil dicit. And, we are told, that it is frequently judicious to plead only to part, or to admit a part of the cause of action, in order to save the costs of the trial of such matter; for, nothing can be tried that is not put in issue, and the defendant by declining to answer a part deprives the plaintiff of the power to burthen him with the costs and expense of proving that on a trial which he has not denied and put in issue. (h) So in equity, where the defendant fails, or declines answering any material part of the plaintiff’s bill, as to which he seeks and may obtain relief, it amounts to a tacit admission of so much; and such part of the bill may, therefore, be taken pro confesso. If the declining to answer a part of the cause of action may, from any motives, be judicious at common law, certainly a defendant in Chancery may be induced, for like reasons, to pursue a similar course; since no costs or expense can be allowed in Chancery any more than at law for the proof and trial of any matter not put in issue. (i)
Upon the whole this rule, in relation to pleadings in equity, appears to be as fully sustained by analogy to the course of the common law as by direct and positive authority.
There is, in many instances, a strong disposition manifested by courts of Chancery, to harmonize their course of proceedings in principle with the positive rules of the common law. But when the Legislature has prescribed rules of proceeding for the court itself; and cases occur, within the spirit, hut not within the letter of them, the Chancellor feels himself, not merely invited, for the preservation of harmony, but becomes sensible of a duty to conform ; upon the ground, that equity is bound to follow the law in spirit and in principle.
In equity, the consequences of a default before appearance, when pursued to the utmost, seldom enabled the plaintiff to obtain the precise relief he was in quest of; because, there could be no adjudication upon his case, applying the remedy, as specific performance, or the like, exactly to suit it, until the defendant had appeared, and the allegations of the bill had been taken for true or established.
*573 The English courts, evidently under a strong sense of the necessity of there being some better mode of attaining justice than by a sequestration of the defendant’s estate, have carried the doctrine, in relation to substituted and constructive summons, full as far as was within the compass of judicial power; further than it ever was in this state; and yet, short of the point of manifest and general utility. In the year 1718,1he parliament partially interposed, and provided the means of enabling a plaintiff to proceed against a defendant, who had not entered his appearance, and to have his bill taken pro confesso, which could not have been done in equity until then, (j) This statute was introduced into this state; (k) and seems to have been the prototype of those various legislative enactments, upon this subject, to he found in our statute book, from the year 1773, down to the present time.
There are many acts of Assembly, under which a hill may be taken pro confesso against a defendant, who has not been summoned ; nor has appeared. They provide for all the cases, that have, or, as it is supposed can occur; absent or absconding defendants ; non-resident defendants, who are either non compos mentis, infants or adults; absent or non-resident mortgagors; defendants whose residences are unknown; resident defendants who cannot be found; the case where there are two or more defendants of one or some of them being non-residents; the case of a bill of revivor where the party had removed out of the state, &c. (l) And where a party has been returned summoned, but has failed or refused to appear and answer, other acts of Assembly provide, that the plaintiff may, according to a prescribed mode, have his hill taken pro confesso. (m)
According to the course of the English courts there are cases in which an implied confession is held to be a sufficient ground for a decree. As where the defendant, having appeared, has been attached for not answering, and is brought three times from prison into court, and has the bill read to him, and refuses to answer; such a public refusal in court amounts to a confession of the whole bill. So, too, where a person appears, and departs without answering, after process has gone against him to sequestration. There *574 also the bill is taken pro confesso; because it is presumed to be true when he has appeared and departed in despite of the court, and withstands all its process without answering, (n) But these modes of having a bill taken pro confesso having been deemed, in many respects, too oppressive, or unnecessarily tedious, more easy and expeditious modes have been provided, by which, if a defendant, who has appeared, fails to demur, plead or answer, according to the rules of the court, within a limited time, the bill may be taken pro confesso. (o)
At law, where the nature and amount of the plaintiff’s demand may be distinctly ascertained from the declaration, as in debt, assumpsit, upon a promissory note, or the like, the judgment by nil dicit is final; but in actions for the recovery of damages only it is not so; because the amount claimed is uncertain; and, therefore, an enquiry must be made and proof heard as to the quantum, which the plaintiff is entitled to recover. Hence it is, that several of our acts of Assembly, which allow the bill to be taken pro confesso, go on to declare, that the Chancellor may, in his discretion, order a commission to issue for the plaintiff to examine witnesses to prove the allegations of his bill; or that the plaintiff may himself be examined on oath; which acts of Assembly, apparently in affirmance of a former course of proceeding, have enabled the Chancellor to call for proofs and explanations in all cases which appear to require it. (p)
These, then, are the legislative rules, in regard to the whole bill where no answer at all is put in. But not one of these acts of Assembly, which seem to have provided, with such an infinite deal of care and solicitude, for all the various causes and modes of neglecting or failing to answer the whole bill, do in any manner speak of or allude to the case of a neglect or refusal to answer a distinct and material part only of the whole bill, where an answer is made to all the rest. It has been declared, that a bill may be taken pro confesso, and the Chancellor shall proceed to decree in the same manner as if the defendant had admitted by his answer the facts stated in the bill. And in case the defendant has been summoned, or has appeared, and fails to answer, he must be ordered to do so by an appointed day, or an interlocutory decree *575 may be entered on the default, and a commission issued ex parte. But, in every case, the consequence of the default is, that the bill may be taken pro confesso. (q)
Hence, it appears to be clear, that these legislative rules which, according to their letter, are only applicable to a case where there is no answer at all; must, in spirit and in principle, be alike applicable to the case where the answer only covers a part of the material allegations, and is totally and absolutely silent as to the residue of the bill. And, that the unanswered part of the bill must, on the hearing, be taken to be true; otherwise, there would be a manifest inconsistency in the course of the court. But, the reason and principle being the same, the rule must be the same in both cases, if the w'hole bill be left unanswered it may be taken for true ; or if a part only be left unanswered, that part must, in like manner, be taken for true.
These acts of Assembly allowing a bill to be taken pro confesso on the defendant’s default in not answering, authorize the Chancellor to pass a final decree at once, if he deems it unnecessary to issue a commission. The decree by default, in all such cases, is as absolute as a judgment by default in an action at common law.
The course of the English Court of Chancery is, in some respects, different. There when the plaintiff obtains a decree by default, a provisional clause is superadded, that such a decree is to be binding on the defendant, unless, being served with process, he shall, within a limited time, shew cause to the contrary. And this decree being sub modo only, is emphatically called a decree nisi; which cannot be, nor ever is considered as final until the party has been served with process, and it has been made absolute by the court itself. (r)
This, it seems, has long been the established practice of the Courts of Chancery of Virginia. So, that where a defendant has not answered the bill, it is held to be error to enter a final decree against him, taking the bill pro confesso, without the previous service of a decree nisi, (s) And it has also been held, in that state, that where some of the allegations of the bill were not answered, the plaintiff might except to the answer as insufficient, or move to have the unanswered part of the bill taken for confessed. But, if *576 he does neither, it must be proved, and he shall not, on the trial, avail himself of any implied admission by the defendant; for •where the defendant does not answer at all, the plaintiff cannot take his bill for confessed, without an order of court to' that effect, and having it served on the defendant; and this is the only evidence of his admission. Of course, if this mode of proceeding, as to the confession of the whole bill, be correct, it must be equally correct as to any part. (t)
Such is the rule as to the Chancery Courts of England and Virginia. The default in not making any answer at all, and that of not answering all the allegations of the bill are precisely alike in kind, differing only in degree; hence the courts of England, and of that state have applied the same rule, in spirit and principle, to both defaults. The party is allowed to pursue the same course to have his bill, either wholly or partially taken pro confesso, according to the extent of the defendant’s default.
In this state, no decree nisi is ever entered and served on a defendant who has not answered; but an absolute' decree may be entered at once, so soon as he can be fixed with the default; which can be at any time after the limited period for answering has elapsed, or when he has elected to make and has actually filed his answers to the bill. The principle and reason of the English and Virginia rule, and that of Maryland, are the same in relation to a partial answer. The courts in each following the spirit of the established or legislative rule, which directs the mode of proceeding in case the defendant puts in no answer at all.
The plaintiff is entitled to an answer to each allegation of his bill, either because he cannot prove the facts, or to aid his proof, or to avoid expense. If the answer be insufficient he may except to it; which has been compared to a demurrer at law for want of form. The sole object of exceptions is to extract from the defendant a more full and perfect disclosure for the benefit of the plaintiff. They are never meant, nor intended, nor are they calculated to benefit the defendant, or to put him upon his guard, in any respect whatever. The plaintiff may waive his right to except; and it is always advisable to do so, where his proofs are ample and at hand; and the character or conduct of the defendant *577 indicates, that he is not altogether trustworthy upon oath; for, in such case the plaintiff will attain his object much sooner by taking the answer as it stands, and proceeding directly to collect his proofs than by stopping to take exceptions. This is the case where the answer is an evasive or imperfect response; and yet goes to the whole, and puts in issue all the allegations of the bill. But to what end, or for what purpose, where no explanation or discovery is sought for by an allegation, should the plaintiff, by exceptions, call for an answer to it, when it is impliedly and tacitly admitted by not being answered? In such case, both parties would be delayed and troubled, and the defendant put to much expense without any object whatever.
The general replication puts in issue only the denial or avoidance of the answer; and neither party is allowed, nor can be called on to adduce proof respecting any matter not put in issue. The unanswered part of the bill, therefore, must be admitted, since it cannot be, according to the correct and orderly course of proceeding, proved at the hearing. But, if the unanswered allegations of a bill were required to be proved, or to be rejected altogether at the hearing, then the defendant would be allowed to take advantage of his own laches; and a want of frankness would be tolerated and encouraged in a manner altogether unbecoming a court of equity. The plaintiff would be driven to except, in all such cases, merely to extract from the defendant either a general, or an express, instead of a tacit disclaimer or confession; -when, in truth, it might have been the intention of the defendant, as it is fair to infer it was, to concede the unanswered allegation for the express purpose of avoiding the costs of an answer, of exceptions and of proofs, by letting a decree by default go for so much as he had left unanswered.
Formerly when the defendant used only to set forth his own case in the answer, without answering every clause of the bill, it was the practice for him to add, at the end of the answer, a general traverse, without that, that the matters set forth in the bill are true, &c. But where the whole bill, and every clause in it, has been fully answered, the adding of a general traverse is rather impertinent than otherwise; and if issue is taken upon this general traverse, it is a denial only of every thing not answered before by the answer, (u) But, there is no case in which this general tra *578 verse has ever been relied upon as an answer. If it ever had been so considered, it must have occurred in some of the numerous cases of exceptions to answers, to have insisted on it as such, ye!, nothing of the kind appears. The whole range of adjudged cases shew, that the extent and compass as well as the sufficiency of the answer, as whether it is as frank as it ought to be, or whether it covers the whole or only a part of the bill, are to be ascertained from the body of the answer itself; and, not from the formal introduction, or the formal general traverse, or conclusion of it. But in this casa the usual general traverse, denying the truth of all the unanswered allegations of the bill, has not been added by way of conclusion to any of the answers.
The late Chancellor Hanson is, however, reported to have said, that ‘no person acquainted with the laws, or rules, or practice of this court, would conceive it the meaning of the Chancellor, that whatever matter stated in a bill is not denied, must be consider d as admitted. No! if interrogatories stated in a bill are not answered, the complainant has a right to except to the answer; and, if the interrogatories are proper, the defendant will be compelled to answer plainly, fully, and explicitly. If then any material matter, charged in the complainant’s bill, has been neither denied nor admitted by the answer, it stands on the hearing of the cause for nought. This assuredly every lawyer will admit.’ (w)
But to the latter part of what is here said I have found myS' df unable to assent; and, therefore, I deemed it a respect due to the memory of my predecessor to set down the authorities and reasons which have led me to a different conclusion. From all that has been said upon the subject, it appears to be agreed on ail hands, that the plaintiff, being entitled to an answer to each material allegation of his bill, may except to an answer which omits to respo ad to any of them; that, in England and Virginia, the plaintiff, by a certain prescribed mode of proceeding, may have the unansweied allegations taken for true; but, if he omits to take that course, for that purpose, and goes to hearing, he must then prove the truth of the unanswered allegations, or they will be disregarded; that, according to Chancellor Hanson, the unanswered allegations stand on the hearing of the case for nought; and, that in my opinion *579 all material allegations of the bill, as to which the answer is entirely silent, are, on the hearing, to be taken pro confesso. (x)
A fifth general rule is, that where an answer, in the body of it, purports to be an answer to the whole bill, but the respondent declares, that he is entirely ignorant of the matters contained in the bill, and leaves the plaintiff to make out the best case he can, or any language to that effect; and the plaintiff files a general replication, all the allegations of the bill are thus denied and put in issue; and, consequently, all of them must be proved at the hearing against a defendant who has thus answered. (y)
This, in England, is said to be the usual form of the answer of the Attorney-General; and no exception can be taken to such answer, nor, indeed, to any answer of the Attorney-General. (z) The same form and rule prevails here where the Attorney-General appears for the State. This also is, commonly, the form of the answer of an infant, or person non compos mentis, who answers by his guardian or committee. And, by a long established practice, *580 individuals, who are, in truth, ignorant of the whole matter as to which the bill requires any disclosure; but who are made defendants as having an interest in the matter in controversy, have been permitted, by this general mode of answering, to deny the whole bill, and to put the plaintiff to prove all its allegations at the hearing. (a) If, however, it appears from the bill, that the defendant has any knowledge of any matter in it, he may be required to answer more fully and particularly to the extent of his knowledge or belief,
Divesting this case then, of all extraneous matter; of all that relates to the two first administrators of the late Anthony Hook; because this plaintiff is incompetent, in the representative character in which he sues, to recover any thing, but so much of the personal estate of his intestate as remains in specie; or has remained, and is now in the hands of any one who can be regarded as a trustee for the use of the late Anthony Hook and his representatives. Of all that which relates to the next of kin of the late Anthony Hook; because none of them, as such, can have any title, but from one of his administrators, and no such title is alleged or pretended; and also, because none of them are made parties to this suit as plaintiffs; and Barbara Hagthrop and James Hook, who have been made defendants, are neither charged as, nor make any claim or defence in right of their being two of the legal representatives of the late Anthony Hook. And the case, when thus cleared, is on the part of the plaintiff simply this:
By a deed, bearing date on the 17th of August, 1797, the late Anthony Hook conveyed certain property, therein mentioned, to the late John Hook, on the terms specified in the deed; which property came to the hands of the late John, and after his dealh passed into the hands of Hagthrop and wife, as his administrators, and is now held and detained by them and the other defendants who claim under them. The plaintiff alleges, that this property, according to the nature and terms of the deed, was conveyed io John as an indemnity in case, and upon condition, that he should pay certain debts therein specified; which have not been paid. And consequently, that the late John Hook had held, and his legal representatives, and those who claim under them, now hold this property as trustees for the use of the late Anthony Hook, and his legal representative, who is now the present plaintiff. Upon which the complainant prays, that this property may be accounted for and delivered up, together with the profits thereof.
*581 The whole of this controversy has grown out of the deed of the 17th of August, 1797, from the late Anthony Hook to his son, the late John Hook. This indenture, after reciting that Anthony Hook being justly indebted to John Moale and thirteen other persons therein named, but without specifying the amount due to all or any of them, declares, that John Hook had agreed to pay to those creditors of his father Anthony their several and respective debts, in consideration of which, and also, in consideration of natural love and affection for his son, and of the further consideration of five shillings, Anthony Hook conveyed to John Hook his leasehold right to two pieces of land, the one a lot of ten acres, part of the tract called David’s Fancy, and the other a lot fronting on Alice-Anna street in the city of Baltimore, together with certain negroes and personal property, all which are particularly described. The indenture then concludes in these words: £To Have and to Hold the said ten acre lot and the other lot on Alice-Anna street for and during all the rest, residue, and remainder of the original terms granted for each respectively, subject to the rents and covenants reserved and contained in the above, in part, recited lease and assignment; and To Have and to Hold all and singular the household and kitchen furniture, plate, and negroes, unto him the said John Hook, his executors, administrators, and assigns, forever. Provided always, and it is the true intent and meaning of these presents, and of the parties hereto, that if the said John Hook, his executors, administrators, or assigns, shall absolutely omit, neglect, and refuse to pay the said recited creditors of the said Anthony Hook, their several and respective just debts and demands against the said Anthony Hook, then this indenture, and every matter, clause, and thing, therein contained, shall cease, determine, and be utterly null and void to all intents and purposes whatsoever, any thing herein contained to the contrary thereof in any wise notwithstanding.’
This proviso and condition is explicit and unequivocal. The estate conveyed to John Hook was to be null and void on his failing to pay and satisfy the enumerated creditors of Anthony Hook. It is in fact a conveyance by Anthony Hook of certain property to John upon condition, that he should advance a certain sum of money for the use of Anthony Hook. This proviso, with the recital, gives to the whole the shape and character of a pledge or mortgage from Anthony to John. It was intended to indemnify John Hook for money advanced by him to the use of his father. *582 And all John can claim, by virtue of this deed, is indemnity and reimbursement for any money so by him advanced.
In the ordinary case of a mortgage the grantor is the actual debtor of the grantee; and it is stipulated, that the estate conveyed shall be absolute if the grantor fails to pay at the appointed time. In this case the grantee undertakes to put himself in the place of the creditors of the grantor, or to satisfy those claims, and if he fails to do so, then, it is stipulated, that the estate conveyed shall be void. The object of the grantor, in both cases, is the payment of his debts; and in both, security is the object of the grantee. That security, in equity, extends no further than complete reimbursement ; the payment of the whole principal and interest due, and no more. (b) There is no clause in this indenture authorizing John Hook to sell the property, and to apply the proceeds to the payment of the claims of the enumerated creditors; and even if there wrere, it would not have destroyed the redeemable quality of this mortgage, or the resulting use arising out of the nature of this deed. (c)
It is alleged, that the late John Hook and his representatives have altogether failed to pay the specified debts in compliance with the stipulations of the deed; if so, Anthony Hook had, and his representative now has, a right to a return of this property, with its profits; or, at least, to redeem it on the payment of so much as has been advanced by John Hook or his representatives in satisfaction of those claims.
It has been urged, that there is not the least room to deduce, from this deed any thing like an implied, or resulting use to Anthony Hook and his representatives; because, it is declared to have been made, not only for a valuable consideration, as the payment of debts, and also of five shillings; but likewise for a good consideration, as the natural love and affection from the father to the son.
The doctrine of a resulting use, first introduced the notion, that there must be a consideration expressed in the deed, or otherwise nothing would pass, but it would result to the grantor. It is certain, however, that the rule, in relation to trusts by implication or operation of law, is by no means so large as to extend to every mere voluntary conveyance; and, consequently, if this deed stood alone upon the valuable consideration of five shillings, and upon *583 the good one of natural love and affection; or upon either of them, unconnected with other circumstances, there could be no doubt of its validity as an absolute and effectual conveyance from Anthony Hook to John Hook, But when other matters are necessarily brought into view, or form a part of the contract, then it is no less clear, that the mere express consideration of five shillings, even with the superadded expressions, ‘and of other valuable considerations,’ or of natural love and affection, will not prevent the deduction of a trust by implication or operation of law. (d) And where a trust is declared as to part, and nothing is said of the residue, what remains so undisposed of results to the grantor. (e)
This indenture cannot be read with a total disregard of its recital and proviso, two of its most important features. We cannot turn aside from clauses so very striking and efficient as the recital of the cause of its having been made, and the proviso wherein it is said if that consideration alone be not complied with, the whole shall be a nullity. If these matters could be entirely passed over, the argument against a resulting trust would be exceedingly strong if not altogether irresistible. But looking to the recital and the proviso, it is perfectly manifest, that the sole object of the deed was to secure the payment of certain creditors of Anthony IIoolc. If they were not paid, the whole deed, utterly regardless of the consideration of five shillings, and of natural love and affection, was declared to be void. The payment of those creditors was that consideration alone upon which the conveyance was to stand or fall. This is the real extent of the consideration; to this extent and no further, the late Anthony Hook parted with his right and interest in this property. Consequently, in the value of this property, beyond that of the aggregate amount of the specified debts, there is an implied or resulting use remaining in Anthony Book the grantor and his representatives; which limited interest of John Hook having been always avowedly held by him and those claiming under him by virtue of this deed, and therefore as trustees, neither he nor they can be allowed to derive any protection from the statute of limitations or lapse of time. But no such defence has been relied on by any of these defendants. (f)
There is an express saving in the statute of frauds of trusts by *584 implication or operation of law; nor does that statute affect trusts of mere personalty; (g) such uses, therefore, might be established by parol proof, if they were not sufficiently manifest from the terms of the deed itself. (h) Let us now, then, turn to the answers and proofs.
Hagthrop and wife have answered jointly. She, before her marriage with Hagthrop, obtained letters of administration on the personal estate of her late husband John Hook; and it is in that character only, that they are now brought here as defendants. They say, in relation to the enumerated creditors of the late Anthony Hook, ‘that the said John Hook paid the said sums of money set out in the assignment, so far as the creditors applied for payment of the sameand again, ‘that the said John Hook accordingly paid the debts particularly mentioned therein, (that is in the deed,) as these defendants believe and charge.’
The first of these sentences cannot be considered as a distinct, answer to any extent; either that the debts have or have not been paid. And the second of them amounts to no more than a declaration of a belief, that they have been paid. Where the nature of the transaction charged in the bill is such as must have been altogether within the knowledge of the intestate, the administrator may answer, as he is informed and verily believes; but the answer of an administrator must always be taken as well with reference to the reasons given for his belief, as to the nature of the subject of which he speaks. This, however, is a broad assertion of a belief, without giving any reasons for it; or its appearing or being alleged, that the matter was exclusively within the knowledge of their intestate. In these particulars this answer is not so responsive to the bill as to constitute an available defence.
But according to the bill and the deed, which is made a part of the bill, John Hook undertook to pay certain debts due from Anthony Hook; the answer to this charge must then, from the nature of things, be such as would furnish evidence available to Anthony Hook or his representatives ; it is that the bill seeks; for, by the deed, Anthony Hook was to be protected from the claims of his creditors therein named; and upon John's affording that protection his title rested. In effect the bill asks, not only whether those debts have been paid or not, but more; it requires the evi *585 dences of their payment to be produced as a means whereby Anthony Hook and his representatives may be protected against those claims. Such evidence, in addition to any thing that might be said in the answer, is also necessary, because it constitutes an affirmative part of that title set up by the representatives of John Hook in opposition to the plaintiff’s claim, and must therefore be supported by indifferent testimony. All the claims of the enumerated creditors, it is most likely, have been long since barred by the statute of limitations ; but, that is a protection which the law itself gave to Anthony Ilook ; he is entitled, by the terms of his deed, to be furnished by John Hook, with the evidence of their having been satisfied, as the means of his protection in that form. This answer, therefore, is not for these reasons also so responsive to the bill as to afford the defendants an adequate defence. On adverting to the proofs and exhibits, it appears, that John Moale’s is the only one of the specified claims, that has been satisfied; and none other are to be allowed and paid.
I lay out of this case the testimony of Henry Burman, who, as the husband of one of the distributees of Anthony Hook, has an interest in establishing the facts to which he testifies, and is, therefore, an incompetent witness. All the other witnesses are competent. From the copy of the unexecuted bond, the declarations of Bishop Carroll, and the other occurrences and proceedings in the Orphans Court, found among the proofs, it appears to have been perfectly well understood between Anthony Hook and John Hook, during their lives, that John held as the trustee of Anthony, according to the terms of the deed, (i) And it appears, that the representatives of John Hook always admitted, that they held under the deed; and yet, except the claim of John Moale, it does not appear, that they ever undertook to shew, that any of the claims of the enumerated creditors had been satisfied. It lay upon John Hook and his representatives to shew, that those claims were paid; they have not done so. And the truth is, therefore, that, except Moalé’s claim, none of them have been satisfied.
The answer of Hagthrop and wife, after some preliminary notices of several allegations in the bill, and those responses as to the payment of the enumerated debts, passes on to a long history of the sayings, actings and doings of sundry of the next of kin of the late Anthony Hook, in relation to the ten acre lot; all of which *586 for the reasons already assigned, it will be unnecessary to say any thing further. The bill specially charges, that Hagthrop and wife, by a deed dated on the 23d of December, 1819, leased or assigned a part of the lot on Alice-Anna street, to Matthew Bennett. Of this special allegation these defendants take no notice; but say, that the late Anthony Hook, by an indenture dated on the 8th of May, 1797, conveyed the lot on Alice-Anna street to the late John Hook. This is an allegation in avoidance of the bill, and certainly required to be supported by proof. But there is not even an exhibit, nor one tittle of proof in relalion to it. This part of the answer therefore passes for nothing. As to all the allegations of the bill, in relation to the negroes, and other moveable property, mentioned in the deed, this answer is absolutely and totally silent; it says nothing. And, consequently, as to so much the bill must, according to the rules herein before laid down, be taken pro confesso.
From what has been said, it follows, that the defendants Hagthrop and wife, as the legal representatives of the late trustee John Hook, will be decreed to deliver up to the plaintiff all the property mentioned in the deed, or to pay the value of so much as they may have converted, or failed to deliver, together with the profits thereof, or the interest on the value; except certain allowances, and those parts wherewith the other defendants may be charged; as I shall now proceed to enquire and determine.
All the other defendants deduce their title, either directly or indirectly, from Hagthrop and wife; except Nathaniel Chittenden, who traces his claim from the late John Hook ; but all allege, that they are purchasers for a valuable consideration without notice.
There is no principle of equity better settled, than that such a bona fide purchaser will not be disturbed by this court. On the other hand, it is equally well settled, that he who purchases with a knowledge of the trust, becomes himself a trustee; and stands in the place of the vendor under whom he thus claims, subject to all his liabilities. Yet a person, having himself notice, who purchases of one who had not notice, may protect himself by a want of notice in his vendor. Nor shall a purchaser without notice, of a previous purchaser with notice, be affected by the notice of his vendor. And where a purchaser cannot make title, but by a deed which leads him to a knowledge of the fact; and more especially where the deed, by virtue of which he takes, recites or directly refers to that instrument in which the trust is declared, or from which it arises, he shall be deemed cognizant of the fact, and a *587 purchaser with notice. These are the well established principles of equity upon this subject. (j)
William McMechen, in his answer, avers, that he is a purchaser for a valuable consideration without notice; and yet he makes an exhibit by his answer, as a part thereof, of a deed dated on the 9th of September, 1803, under which he takes from Hagthrop and wife, in which the indenture from Anthony Hook to John Hook, out of which the trusts arise, is clearly and distinctly referred to as one of the links in the chain of the title of Hagthrop and wife. This, of itself, is enough to shew, that McMechen is a purchaser with notice. But the proofs leave no doubt upon the subject; they shew that he had ample notice. This defendant, therefore, will be decreed to deliver up and reconvey to the plaintiff whatever of the ten acre lot, thus acquired by him, he may now hold; and to account for the rents and profits thereof from the date of the deed under which he obtained possession, with such just allowances as he may be entitled to; the nature of which shall be specified.
Samuel Moore and George A. Hughes answer jointly, they positively aver, that they are purchasers of William McMechen for a valuable consideration without notice. But they exhibit no evidence of title, nor any proof of right whatever. According to the rules and principles before laid down, they cannot be permitted thus to swear themselves into the estate of the plaintiff; and, consequently, even if their answer were, in other respects, fully responsive to the bill, it could not avail them as a defence, unsupported as it is by proof. These defendants will, in like manner, be decreed to deliver up and reconvey to the plaintiff the property held by them ; and be also charged with rents and profits from the first day of May, 1818, when it appears they obtained possession.
John Gator, by his answer, states, that he purchased of Mc-Mechen, that which he holds. His predicament and pretensions are similar, in all respects, to those of Moore and Hughes. Gator, therefore, will likewise be decreed to deliver up and reconvey; and also to account for the rents and profits of what he holds, from the first of May, 1818, when he was let into possession; with such just allowances as shall be specified.
John S. King, by his answer, states, that he leased from the defendant Calor; but having exhibited no better title than his les *588 sor, will be, in like manner, ordered to deliver up, reconvey, and account for the rents and profits to the plaintiff from the 9th of March, 1819, when he took possession.
John Weaver, in his answer, says, that he too is one of those who purchased of William McMechen. This defendant has also left his answer wholly unsupported by any exhibits or proofs. He will therefore be decreed to deliver up, reconvey, and account for the rents and profits to the plaintiff. He admits, that he obtained possession in the year 1819; but does not specify the day or month; a medium, in the absence of such proof, must therefore be assumed, and the account must commence on the first day of July of the year 1819; with such just allowances as shall be specified.
The defendant John Fitzgerald, in his answer, states, that, on the 4th of September, 1806, he purchased of John H. Hall, a part of a parcel of ground, containing ten acres, part of a tract of land called David’s Fancy, that he gave for it a valuable consideration, and had no notice of the claim of the representatives of the late Anthony Hook. He then goes on to state, that he purchased of the defendant Hagthrop two other parcels of the same ten acre lot, the one on the 9th of August, 1810, and the other on the 17th of June, 1815; and that he purchased a fourth parcel of it on the 17th of September, 1811, of Gerard Tipton, for all which he avers, he paid a valuable consideration; and that he had no notice of the claim of Anthony Hook’s representatives. This answer is also entirely unsupported by any evidence whatever; and therefore, this defendant will be decreed to deliver up, and reconvey to the plaintiff so much of the ten acre lot, mentioned in the bill, as he holds ; and will also be held accountable for the rents and profits thereof from the dates when he obtained possession of each parcel respectively. The nature of the just allowances to which he may be entitled will be described.
Benjamin Rawlings, surviving executor of the late William Rawlings, states, that his co-executrix Catharine Rawlings, -who had been made a defendant, is dead, that he is in possession of part of the ten acre lot, in the bill mentioned, by virtue of a deed bearing date on the 10th of September, 1804. This answer is also entirely unsupported by proof. This defendant will be decreed to deliver up and reconvey the property so held by him to the plaintiff; and be charged with the rents and profits, as executor, from the date of the deed under which his testator obtained possession, with such just allowances as shall be specified.
*589 The defendant Matthew Bennett, in his answer, says, that he is in possession of a part of the ten acre lot, mentioned in the bill, which he holds under a conveyance from Iiagthrop and wife, dated on the 3d of August, 1810. But this defendant too has left his answer entirely destitute of proof. The bill expressly alleges, that Iiagthrop and wife, by deed dated on the 23d of December, 1819, leased a part of the lot on Alice-Anna street to Matthew Bennett. In relation to which this defendant says nothing in his answer; this allegation of the bill, as against him, must therefore be taken for true. He will be decreed to deliver up and reconvey all the property held by him to the plaintiff; and to account for the rents and profits of each parcel from the time he took possession.
The defendant JYathaniel Chittenden, admits, that he holds possession of a part of the lot on Alice-Anna street, to which he derives title through various mesne conveyances, from the late John Hook. He avers, that he, and those under whom he claims, were, all of them, purchasers for a valuable consideration without notice; but produces no proof in support of these allegations of his answer. He, therefore, will, in like manner, be decreed to deliver up and reconvey the property so held by him to the plaintiff, and be held accountable also for the rents and profits.
The defendant James Hook, on the 7th of February, 1823, filed his answer, as he says therein, to the amended bill of the complainant ; but there does not appear to have been any amended bill put upon the record until some time after that day. There is, howTever, no charge wdiatever made against this defendant; and therefore the bill will be dismissed as to him with costs.
I have said, that the recital and proviso, of the indenture of the 17th of August, 1797, from Anthony Hook to John Hook, gave to that instrument the features and character of a mortgage. Consequently the original parties stood, and their legal representatives now stand in the relation to each other of mortgagor and mortgagee, or trustees and cestui que trusts. No acts or circumstances appear to have occurred to destroy the redeemable quality of that deed. Hagthrop and wife, as administrators of the late John Hook, have succeeded to his character of trustee. And the defendants, who all claim under them, except JYathaniel Chittenden, who deduces his claim from the late John Hook, being purchasers with notice, for so much as they respectively hold, stand charged with the same trusts.
The whole of the properly mentioned in the bill has been conti *590 nually in the possession of the late John Hook, and those who have succeeded to and claim under him ever since the year 1797. They have protected it, relieved it from burthens and charges, and have placed upon some parts of it lasting improvements. It now, therefore, only remains to apply the rules of equity in relation to these matters, and to direct how the accounts shall be taken,
If a mortgagee, without the assent of the mortgagor, assigns the mortgaged estate to an insolvent person, who ,he puts into possession, he will be held answerable for the rents and profits received both before and after the assignment. Upon the principle of its being a wilful breach of trust to transfer the property to another; which, as trustee, he had no right thus to dispose of to the prejudice of the mortgagor. (k) j A trustee is, in no case, to be charged with imaginary values; but only with what he actually receives. And the same rule applies to a mortgagee in possession, who is regarded as a trustee. But no default must be imputed to him; for, in all such cases, he will be charged with what he might have made, but for his default. The annual value is that which the premises are actually worth net, according to a fair estimate, clear of all necessary charges.
Under the head of just allowances, it has long been the course of the court, to allow a trustee, or mortgagee, in possession, for all necessary expenses incurred for the defence, relief, protection, and repairs of the estate; such as costs of suit, and fees for taking opinions and procuring directions necessary for the due execution of the trust; (l) taxes, paving contributions, ground rent, and sums expended in necessary repairs, (m) It has been also said, and I think with justice, that when a mortgagee, thinking himself absolutely entitled, had expended considerable sums in repairs and lasting improvements, he should be allowed the value of them, (n) In a modem case, the value of new buildings, erected by the mortgagee, was allowed, (o) And a liberal allowance for the improved value of slaves while in the possession of the mortgagee was directed to be made. (p) The grounds of these decisions appear to be that a mortgagee in possession is the legal holder of the estate; which the mortgagor may at any time redeem; and so prevent him from making any repairs or improvements.; and if the *591 mortgagee has been long in possession claiming adversely, and suffered to treat the estate as his own, and the mortgagor stands by and permits lasting improvements to be made, he shall pay for them. (q)
But the estimate of the value of such lasting improvements is to be taken as they are at the time of accounting or passing the final decree. For, such allowances are made upon the ground, that the improvements do, in fact, pass into the hands of the plaintiff as a new acquisition. And they can only be a new acquisition to him to the extent of their value at the time he recovers or obtains possession of them; and therefore their value at that time is to be allowed, and nothing more. (r) It is also necessary to observe, that in charging rents and profits, the estimate must not include any profits which arise exclusively from such improvements ; for, if they were to be embraced by the estimate, the occupier would, in fact, be paying for the profits of that which was his own. Therefore the estimate of rents and profits must be made in exclusion of such as appears to have arisen from the occupying claimant’s own expenditure in improvements. (s)
The late John Hook disposed of the lot on Alice-Anna street, and his representatives Hagthrop and wife, having disposed of the other property in a manner in which they had no right to do, and the bill standing unanswered and for true as to the negroes and moveable property ; Hagthrop and wife must be charged with the value of the whole of that property and interest thereon from the date of the deed from the late Anthony Hook to the late John Hook; and the account for the rents and profits of the chattels real, will commence from the same date. Hagthrop and wife must be charged with the rents and profits of all the chattels real, mentioned in the bill, up to the time when they, or any part of either passed into the hands of any of the present defendants. But Hagthrop and wife will be held liable for the whole charged against the other defendants, or to the amount which all, or any of them may fail, or be unable to pay to the plaintiff. And these defendants must be credited with the aggregate of the debt which was due from Anthony Hook to John Moale, at the time of the *592 execution of the deed to John Hook, with interest thereon from the time when it appears to have been paid.
The account against each of the other defendants will commence from the day on which it appears by his answer, or by the proofs now in the case, or which may hereafter be exhibited, that he obtained possession; and he will be charged for all the time he held that portion of the property, or until it passed into the hands of another of the defendants. The accounts against each of the defendants who is now a holder of any portion of the property is, for so much as he holds, to be brought down to the time of taking the account.
Whereupon it is Ordered, that this case be and the same is hereby referred to the auditor with directions to state an account, or accounts accordingly from the proceedings and proofs now in the case, and such other proofs as may be laid before him. And it is further Ordered, that the parties be and they are hereby allowed to take testimony in relation to the accounts, so directed to be stated, on giving three days notice as usual. Provided, that the testimony be taken and filed with the register on or before the fifteenth day of January next.
From this order the defendants appealed on the 12th of February, 1827. And the same day, on their petition, the time for taking and returning testimony under it was enlarged to the 16th of April following. At the same time an agreement was filed with a deed from John Hook to Patrick Bennett, bearing date on the first of January, 1799; by which agreement it is said, ‘that upon the final decree to be passed the lot or parcel of ground contained in that deed, and which has since been conveyed to Harriet Chittenden, shall be excluded from the decree.’ Upon which the Chancellor made a memorandum, that in any future order or decree, that agreement should be noticed and respected. On the first of January, 1828, the auditor filed his report and accounts made up to the 17th of November, 1827.
The plaintiff by his petition stated, that the defendant Edward Hagthrop was in possession of a large proportion of the property in the proceedings mentioned; that he was receiving rents from the tenants of it to the amount of $ 1,200 per annum; that he was in desperate circumstances and without credit, so that when finally called upon to pay the moneys collected by him he would apply for the benefit of the insolvent law; that the defendant Barbara, *593 his wife, was dead; and that, except the defendants Hughes and Moore, none of the other defendants were in safe and abundant pecuniary circumstances. Whereupon he prayed that a receiver might be appointed, &c.
12th April, 1828.-
Bland, Chancellor.
Ordered, that the matter of this petition be heard on the 20th day of May next. Provided, that a copy of this order, together with a copy of the foregoing petition, be served on each of the said defendants, except Samuel Moore and George A. Hughes, on or before the 22d day of this month. And either party is hereby authorized to take testimony before the commissioners, in the city of Baltimore, to be read at the hearing, on giving three days notice as usual.
The defendant Hagthrop on the first of May, 1828, answered the application for a receiver, on oath, in which he admitted, that he held the property in question; but denied, that he had received the amount of rents and profits as charged by the plaintiff; and said, that he believed he should be able to pay all his debts, provided he could obtain justice from those who withheld from him his just rights, &c.
Under this last order some testimony was taken and filed on the 23d of May following, from which it appeared, that the defendant Hagthrop was in straitened circumstances, and had himself admitted, that he was not rvorlh a dollar. And that some of that which the witness supposed to be the property in question was occupied by worthless negroes.
After which the defendants, by their petition, stated that their appeal had been dismissed by the Court of Appeals, on the 19th of November, 1828, without costs, 1 G. fy J. 308; and it had therefore become necessary to take testimony to enable the auditor to state an account as had been directed by this court. Whereupon they prayed, that a commission might be issued to the Baltimore commissioners, &c.
20th November, 1828.
Bland, Chancellor.—
Ordered, that the parties be and they are hereby allowed to take testimony before the commissioners appointed to take testimony in the city of Baltimore, in relation to the accounts directed to be stated by the order of the 5th of December, 1826, on giving three days notice to the opposite party, or his solicitor, as usual. Provided, that no testimony be used before the auditor, or in any way admitted into this *594 case, unless it be taken and filed with the register on or before the first day of March next.
After which the plaintiff, by petition, renewed his application for the appointment of a receiver and recommended Edward Pannell to be appointed, &c. The matter was ordered to stand for hearing on the 29th instant; and then, by consent, the time of hearing was enlarged to the 9th of December following. After which it was brought before the court.
13th December, 1828.
Bland, Chancellor.
The application for the appointment of a receiver standing ready for hearing, and the solicitors of the plaintiff having been heard, and no one appearing on behalf of the defendants, the proceedings were read and considered.
There does not appear to be any just grounds for the appointment of a receiver to take charge of the property in the possession of any one except the defendant Hagihrop.
Whereupon it is Ordered, that Edward Pannell, jr. of the city of Baltimore, be and he is hereby appointed a receiver, as prayed by the petition of the said plaintiff; and that as such he is hereby invested with full power and authority to enter upon and take possession of all the houses, lots, lands, and other property; and also to receive and collect all the rents of the said property in the proceeding mentioned, which is now in the possession or under the control of the said defendant Edward Hagthrop; and to take care of, rent, or otherwise dispose of the same pending this suit, and subject to the further order of this court, in such manner as may be deemed most advantageous to the parties interested. And with full power and authority to ask, demand, sue for and recover any sums now due or which may hereafter become due for or on account of the rents and profits of the said houses, lots, and premises. And the said receiver shall bring into this court, and account for all moneys, rents, and profits received by him; and, when called on, render a full account, on oath, of all his proceedings. And the said Edward Pannell, jr. before he acts as receiver shall execute and file in this case a bond to the state of Maryland in the penalty of one thousand dollars, with surety to be approved by the Chancellor, conditioned for the faithful performance of the trust hereby reposed in him, or that may hereafter be reposed in him by any future order of this court. And the compensation of the said receiver *595 shall hereafter be determined upon consideration of his trouble, skill, and diligence in the premises.
The receiver gave bond as required. On the 13th of March, 1829, the Baltimore commissioners returned the testimony taken by them under the order of 20th of November. The auditor, in a report filed on the 10th of December, 1829, stated, that he had examined and considered the additional testimony which had been brought in ; much of which was uncertain and unsatisfactory; but, that he had, as instructed by the plaintiff’s solicitor, restated the accounts, &c. The plaintiff, by his petition, stated, that the auditor had found it difficult to make an accurate report for the want of a plot of the land in dispute, designating the particular part in the possession of each one of the defendants, so as to apply the testimony to each, as directed by the order of the 5th of December. Whereupon he prayed for a survey; for leave to take further testimony, &c.
After which an agreement in the following words was filed. ‘It is agreed between the parties to said cause, that Matthew Bennett, one of the defendants, be struck out as a party to said bill without prejudice to said cause. And it is further agreed, that the auditor’s report be remanded to him; and that the commission to take testimony to be used before the auditor, be remanded to Baltimore, and that a plot be made of the land in dispute in said cause, and the witnesses be examined in relation thereto, agreeably to the complainant’s petition filed on the 24th instant. And it is also agreed, that so soon as the auditor’s report is completed and filed, that the said cause shall be set down for final hearing.’
5th June, 1830.
Bland, Chancellor.—
Ordered, that this case be and the same is hereby again referred to the auditor; that the said commission, or a duplicate thereof, be sent to the commissioners to take further testimony; and that a survey be made of the property in the proceedings mentioned, as prayed, on giving the usual notice. Provided, that the testimony and plots, hereby allowed to be taken and made, be returned and filed in the Chancery Office on or before the 24th day of July next.
Under this order the lands were laid down and plots with much additional testimony was returned.
The auditor, on the 29th of March, 1831, filed his report, in which he says, that he had restated all the accounts and made his *596 calculations up to the 17th of February, 1831. He then goes on to say, that the complainant had located the four purchases of Fitzgerald, a defendant, stating upon his plot the dates of the several conveyances. The auditor has, for want of better evidence, adopted those locations and statements. The complainant has examined three, and the defendant five witnesses to prove the permanent ground rent which those lots would have yielded, if they had been leased between the years 1804 and 1810. Mary Riley, one of the complainant’s witnesses, has also proved, that there were two houses on the lots erected in or before the year 1797; viz: a single frame house two stories high, and a double frame house one and a half story high. The auditor infers from other testimony, that those houses might have rented for, from three to five dollars a month each. But there is no proof of their value, independent of the ground rents attached to them; and the auditor infers, that the ground was chiefly valuable for the purposes of building, which requires their removal. The auditor, therefore, inclines to think, that he should charge the defendant John Fitzgerald only with the average ground rent, as estimated by the aforesaid witnesses. And he has allowed for the value of certain improvements which appear to have been made.by the defendant. And the auditor is further of opinion, that the value of the said, premises, for the time prior to their alienation, should not be estimated at a higher rate than for the time subsequent.
' The auditor further says, that the complainant has also located the possession of the defendant Benjamin Rawlings, The plaintiff has examined three, and the defendant five witnesses, to prove its value. It is also proved, that in 1797 there was a small two story frame house on the premises, which, it is inferred from other evidence, might have rented for four or five dollars a month. But there is no proof of its value, independent of the ground annexed to it, and it is supposed the ground was chiefly valuable for building, which would require its removal. The auditor, therefore, thinks he should charge said defendant only with the average ground rent, as estimated by the aforesaid witnesses; and that the value thereof for the time prior to its alienation should not be estimated at a higher rate than for the time subsequent. The complainant has also located the possessions of John Weaver, and proved, that the lots, in 1818, might have been leased at a rent of two dollars for every foot fronting on Goodman street; and the auditor has stated the account accordingly. The complainant has- *597 also located the possessions of John S. King, John Gator, Samuel Moore, and George Ji. Hughes, and offered similar proofs of their value. And the auditor has stated the accounts against these defendants accordingly. The complainant has also located the possessions of the defendant William McMechen, and offered proof, that in 1818, the property might have been leased at a rent of two dollars per foot fronting on Goodman street, and the auditor adopts this evidence of value for the time since 1818. No further proof has been offered of the value prior to 1818. The complainant has located several small houses on the premises; but has offered no proof that they were erected in 1797. The auditor is not satisfied with his estimate of the value of this property prior to the first of May, 1818; but having no data before him by which it might be corrected, he has adopted it in his present account.
The auditor further says, that the complainant has located the possessions of Edward Hagthrop and wife, and offered proof, that the ground fronting on the Ferry road and Goodman street, might have been leased, in 1818, at a rent of two dollars per foot. This proof has been adopted by the auditor in his estimate herewith returned. The auditor excludes any allowance for the rent of the Mansion House, and the house on Light street since the first of May, 1818; because there is no proof of their value independent of the ground attached to them. And the estimates of their value for the time prior to the first of May, 1818, seems defective as it is predicated upon proof of their average value from 1797 to 1827; whereas the proof should have been of their average value from 1797 to 1818. The estimate of the value of the property conveyed to William McMechen is unsatisfactory for the reasons before stated. The account, as stated, is nevertheless the best that can be stated from the proofs before the auditor. The allowance for the value of the house on Goodman street is increased to S$l,500 on the authority of the depositions of Thomas Childs and Richard A. Shipley, filed 16th August, 1830. All the accounts are stated with interest to this date.
To this report of the auditor, the defendant Edward Hagthrop excepted; first, because the auditor had charged him with the sum of twro dollars per foot for the lands fronting on the Ferry road and Goodman street, which was not sustained by the proofs. Second, because the auditor had charged this defendant with the value of certain negroes, personal property and chattels real, amounting to $60,667 30, when in truth such negroes, personal property and *598 chattels real, and the value thereof, are not sustained by any proof, Thirdly, because the auditor hath not allowed this defendant the several sums of money laid out, expended and paid by him on account of the lands and property mentioned in the the proceedings: and for large sums of money paid to the representatives of Anthony Hook by this defendant, and the defendant Barbara, all which are fully proved by sufficient evidence. And fourthly, because this defendant is made debtor for $56,899 42, when in truth all the negroes, personal property and chattels real, whence that sum arises, principally belonged to him, though claimed under Barbara,, all which is fully sustained by the proof.
The defendant Benjamin Rawlings also excepted to this rep or: of the auditor. First, because he had placed too high an estimate on the annual value on the lot therein mentioned; and charged this defendant with more ground rent for the same than was justified by the evidence. And secondly, because the auditor has not estimated the value of the improvements erected on that lot at as much as they are shewn by the evidence to be worth. And the defendant John Fitzgerald excepted also to this report of the auditor for the same reasons.
After which the plaintiff, by his petition, filed on the 5th of October, 1831, stated, that since the passing of the order of the 5lh of December, 1826, the defendant Chittenden had departed this life, and that the lot of ground which had been held by him, as in the proceedings mentioned, was then in the possession of Harriet Chittenden, his widow and legal representative; that this plaintiff has since discovered, that the title to this lot of ground was, in truth, and only deducible from the deed of trust of the 17th of August, 1797. Wherefore he prayed, that the agreement, filed on the 12th of February, 1827, might be rescinded and withdrawn. Upon which the Chancellor suggested to the solicitors, that as the case had abated by the death of the defendant Chittenden, there could be no further proceedings had until it had been revived against his legal representatives.
Charles Frenour, by his petition, filed on the 29th of November, 1831, stated, that prior to the execution of the deed of trust of the 17th of August, 1797, the late Anthony Hook had by a deed bearing date on the 8th of May, 1797, conveyed the one-half of the lot on Alice-Anna street to John Hook, from whom it had passed to this defendant Edward Hagthrop, under whom this petitioner claimed. Whereupon he prayed, that all such of the proceedings, in this *599 case, as related to the one-half of the lot so claimed by him should be stricken out, &c.
29th November, 1831.
Bland, Chancellor.—
Ordered, that the matter of the foregoing petition stand over until the case shall have been revived and brought before the court for a final hearing.
After which the plaintiff, by his petition, stated, that the controversy in relation to the ten acre lot was then ready for final hearing, and the parties interested all before the court; that the controversy in relation to the lot on Alice-Anna street was not then ready for final hearing, inasmuch as one of the parties in interest was not before the court. And as the controversy in relation to the ten acre lot may be finally determined without injury or inconvenience, leaving the property on Alice-Anna street for future adjudication. And as the matters now remaining in dispute, and the difficulties in the way of a final decision, in relation to the Alice-Anna street property, present no obstacles to a final decision in relation to the ten acre lot; and inasmuch as the parties are in needy circumstances ; and also as the property cannot be improved until the right to it is finally settled; the petitioner prayed, that the court would proceed to a final decision upon the questions in regard to the ten acre lot, retaining for future adjudication so much of the controversy as relates to the property on Alice-Anna street.
17th February, 1832.
Bland, Chancellor.
Where there are a plurality of defendants, and one of them dies, who had an interest which does not devolve upon the surviving parties, but which might, in all respects, have been separated by that final decree which the court would have passed; and which interest of the deceased is of such a nature as not necessarily to involve an expression of the judgment of the court upon that which does obviously constitufe a component part of the title relied upon by the surviving defendants, it may, in some instances, be expedient and proper to pass a decree upon the matter in controversy as to the surviving defendants, and to leave the separate interest of the deceased open fo be afterwards brought before the court at a more convenient season, or when required by his representatives. (t)
But here all the original defendants alike derive title under or in opposition to one and the same deed; upon the true construction *600 of which all their titles must mainly depend; and therefore they have all of them been properly brought before the court as parties. It is true, that any one of them might, under circumstances peculiar to himself, have been enabled to sustain his own pretensions alone; yet the deed of the 17th of August, 1797, being that foundation upon which the plaintiff plants his claim against all, an expression of the court’s opinion upon that deed, from what has been shewn, must necessarily and alike affect all; and the directions, upon that ground, have been given for taking the accounts. Hence, although the property in the hands of each defendant maybe entirely distinct, and the quantum of liability of each may be different; yet the origin and foundation of the controversy is essentially and necessarily the same as to all. And, therefore, before the case can be suffered to proceed, the bill must either be dismissed or absolutely abated as to-the claim .of the deceased defendant Chittenden, or be revived against his representatives.
Whereupon it is Ordered, that the foregoing petition be and the same is hereby dismissed with costs.
After the filing of a petition to make Harriet Chiitenden a party, and she had been returned summoned as the administratrix and legal representative of the deceased defendant Nathaniel Chittenden, by a writing, signed by the solicitors of the.parties, and filed on the 14th of May, 1832, it was agreed between the complainant and Harriet Chittenden, administratrix ■ of Nathaniel Chittenden, deceased, that the petition filed against her should be dismissed ; and the agreement heretofore entered into relative to the property in her intestate’s possession be confirmed.
4th August, 1832.
Bland, Chancellor.
This case standing ready for hearing and having been submitted by the plaintiff without argument, and no one appearing for the defendants before the close of the sittings of the term, the proceedings were read and considered.
It appears, that the auditor has, in all respects, made his estimates according to the principles, and in the manner directed by the order of the 5th of December, 1826, with interest on the amount of rents and profits charged to each defendant from the end of each year when they were received; and the whole appears to be well sustained in point of fact by the proofs, in the manner he has stated; therefore overruling all the exceptions to his report, it must be confirmed; subject, however, as regards the defendant Edward Hagthrop, to a deduction for that amount of rents and *601 profits of the property held by him from the time it was placed in the hands of the receiver, until the 17th of February, 1831, up to which day the auditor’s statements have been made.
It appears to have been the practice in many cases in this court, where the object of the suit was to recover certain specified properly, together with its rents and profits during the time of its unjust detention, to order an account of the rents and profits to be taken before the property itself was ordered to be delivered up. The inevitable consequence of such a course of proceeding is, that after the account has been so taken, and the property has been delivered, there will remain a claim for an unascertained amount of rents and profits which have accrued between the time up to which the account had been taken, and the delivery of possession, to be adjusted and recovered by a subsequent proceeding. (u)
Observing the impropriety and inconvenience of this practice, I shall follow it no further. In cases of this kind a final decree should be passed directing the specific property to be delivered up ; followed by a clause directing an account of the rents and profits to be taken up to the time of such delivery. By such a decree the controversy would be so far terminated; and the property itself being thus transferred to its true owner, there could be no occasion to call for the appointment of a receiver, as in this instance, to preserve it from any loss or injury to which it might be exposed while remaining in the hands of the defendant. And an exact period being thus fixed up to which the account may be brought by such a final determination in favour of the plaintiif’s title, his rights, consequent upon that determination may be also finally decided, and the whole case closed, without going again to the auditor for a further account. (w)
It will be necessary, however, again to send this case to the auditor for the purpose of stating a final account upon the same principles, and in continuation of that last stated by him, shewing the amount of rents and profits with which each defendant is chargeable from that time to the time when the property shall have been delivered to the plaintiff. .And for this purpose, the receiver in whose hands the property held by the defendant Edward Hagthrop has been placed, must also be ordered to make a *602 full report, on oath, of all his proceedings up to the time he shall have delivered the property now in his possession to the plaintiff.
The bill must now be dismissed with costs as to the defendant James Hoolc, for the reasons before given. And, as the claims against the defendants Nathaniel Chittenden and Matthew Bennett have been abandoned by the plaintiff, there can be no occasion for any such relief as is prayed by the petitioner Charles Frenour; and therefore all the proceedings in relation to these three persons may be at once and finally dismissed.
Whereupon it is Decreed, that the report of the auditor, made and filed on the 29th of March, 1831, be and the same is hereby ratified and confirmed, and all the exceptions thereto are overruled.
And it is further Decreed, that all deeds and conveyances from the said defendants Edward Hagthrop and Barbara his wife, or either of them, or from any other person or persons claiming by, through, or under them, or either of them, for all or any portion of the chattels real, in the proceedings mentioned, called the ten acre lot, unto the said defendants William McMechen, Samuel Moore, George A. Hughes, John Cator, John S. King, John Weaver, John Fitzgerald, and Benjamin Rawlings, or any or either of them, or unto any person under whom they, or any, or either of them claim, be and the same are hereby deemed, taken and declared to be utterly null and void to all intents and purposes whatever. And the said defendants Edward Hagthrop, William, McMechen, Samuel Moore, George A. Hughes, John Cator, John S. King, John Weaver, John Fitzgerald, and Benjamin Rawlings, are hereby directed and required forthwith to re-assign and reconvey the whole of the chattel in the proceedings mentioned, called the ten acre lot, unto the said plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased; and that Nathaniel Williams of the city of Baltimore, be, and he is hereby appointed trustee for the purpose of making and executing such conveyance to the said plaintiff, in the name of the said defendants, according to the provisions of the act of Assembly in such case made and provided. (x)
And it is further Decreed, that the defendant Edward Hagthrop and the receiver Edward Panned, jr. forthwith deliver up all that portion of the said ten acre lot, which is, or may be in possession of them, or either of them, as in the proceedings mentioned, unto *603 the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased; and that the defendant Edward Hagthrop forthwith pay or bring into this court to be paid unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased, the sum of $56,899 43, with interest on ,$33,879 76, part thereof, from the 17th day of February, 1831, until paid or brought into court; subject, however, to a deduction for such an amount for rents and profits which have accrued and been received by the said receiver under the order of the 22d day of November, 1828, and before the 17th day of February, 1831.
And it is further Decreed, that the defendant William McMechen forthwith deliver up all that portion of the said ten acre lot which is, or may be in his possession, as in the proceedings mentioned, unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased; and that the defendant William McMechen forthwith pay or bring into this court to be paid unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased, the sum of $15,532 41, with interest on $10,501 92, part thereof, from the 17th of February, 1831, until paid or brought into court.
And it is further Decreed, that the defendants Samuel Moore and George A. Hughes forthwith deliver up all that portion of the ten acre lot which is, or may be in the possession of them, or cither of them, as in the proceedings mentioned, unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased; and that the defendants Samuel Moore and George A. Hughes forthwith pay or bring into this court to be paid unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased, the sum of $4,160 47, with interest on $3,070 67, part thereof, from the 17th of February, 1831, until paid or brought into court.
And it is further Decreed, that the defendant John Cator forthwith deliver up all that portion of the said ten acre lot which is or may be in his possession, as in the proceedings mentioned, unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased; and that the defendant John Cator forthwith pay or bring into this court to be paid unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased, the sum of $3,208 16, with interest on $2,354 33, part thereof, from the 17th of February, 1831, until paid or brought into court.
And it is further Decreed, that the defendant John S. King forth *604 ■with deliver up all that portion of the said ten acre lot which is or may be in his possession, as in the proceedings mentioned, unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased; and that the defendant John S. King forthwith pay or bring into this court to be paid unto the plaintiff James Neale, administrator de bonis non of Anthony Hook,' deceased, the sum of $952 30, with interest on $716 33, part thereof, from the 17th of February, 1831, until paid or brought into court.
And it is further Decreed, that the defendant John Weaver forthwith deliver up all that portion of the said ten acre lot which is or may be in his possession, as in the proceedings mentioned, unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased; and that the defendant John Weaver forthwith pay or bring into this court to be paid unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased, the sum of $3,989 94, with interest on $3,023 22, part thereof, from the 17th of February, 1831, until paid or brought into court.
And it is further Decreed, that the defendant John Fitzgerald forthwith deliver up all that portion of the said ten acre lot which is or may be in his possession, as in the proceedings mentioned, unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased; and that the defendant John Fitzgerald forthwith pay or bring into this court to be paid unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased, the sum of $4,020 97, with interest on $3,054 25, part thereof, from the 17th of February, 1831, until paid or brought into court.
And it is further Decreed, that the defendant Benjamin Rawlings, surviving executor of William Rawlings, deceased, forthwith deliver up all that portion of the said ten acre lot which is or may be in his possession, as in the proceedings .mentioned, unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased; and that the defendant Benjamin Rawlings, surviving executor of William Rawlings, deceased, forthwith pay or bring into this court to be paid unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased, the sum of $2,320 34, with interest thereon from the 17th of February, 1831, until paid or brought into court.
• And it is further Decreed, that the bill of complaint, as against the defendants James Hook, Matthew Bennett, and Harriet Chittenden, administratrix of the late defendant Jfathaniel Chittenden, de *605 ceased, be and the same is hereby dismissed with costs, to be taxed by the register.
And it is further Decreed, that the receiver Edward Pannell, jr. forthwith pay or bring into court to be paid, all the moneys collected by him as such, unto the plaintiff James Neale, administrator de bonis non of Anthony Hook, deceased; and that the said receiver render unto this court, without delay, a full account, on oath, of all his proceedings as such. And this case, as regards the said receiver, is hereby referred to the auditor, with directions to state an account between him and the plaintiff; allowing to the said receiver a commission of eight per centum as a compensation for his trouble.
And it is further Decreed, that this case, as regards those defendants against whom the bill of complaint has not, by this decree, been dismissed, be and the same is hereby referred to the auditor, with directions to state an account or accounts upon the principles, and in continuation of the accounts last reported by him from the proofs and proceedings now in the case, and such other proofs as may be laid before him, shewing the amount of the rents and profits with which each of the said defendants is chargeable from the 17th of February, 1831, to the time when that portion of the said chattel real called the ten acre lot held by them,'or any or either of them, shall have been delivered up as herein directed to the plaintiff James Neale.
And it is further Decreed, that the petition filed in this case by Charles Frenour, be and the same is hereby dismissed with costs, to be taxed by the register.
And it is further Decreed, that the defendants as against whom the bill of complaint has not been dismissed, pay unto the plaintiff his costs in this suit, to be taxed by the register.
As to the manner in which this case was finally disposed of by the Court of Appeals, see 7 G. & J. 13.

 Popham v. Bampfield, 1 Vern. 83, 344; Welford v. Leddel, 2 Ves. 400; Fitzgerald v. Burk, 2 Atk. 397; Jeffreys v. Baldwin, Amb. 164; Fry v. Penn, 2 Bro. C. C. 280; Jacobs v. Foodman, 2 Cox, 282; Lee v. Alston, 1 Ves., jun., 82; Milbourn v. Fisher, 5 Ves. 685, note; Sutton v. Scarborough, 9 Ves. 75; Baker v. Mellish, 10 Ves. 553; Corporation of Carlisle v. Wilson, 13 Ves. 276; Rowe v. Teed, 15 Ves. 377; Drew v. Drew, 2 Ves. & B. 161; Jones v. Jones, 3 Meri. 163; Williams v. Steward, 3 Meri. 502; Attorney-General v. Brown, 1 Swan. 294; Holloway v. Millard, 1 Mad. Rep. 421; Lorimer v. Lorimer, 5 Mad. 363; Sanders v. King, 6 Mad. 63; Mendizabel v. Machado, 2 Cond. Cha. Rep. 40; Moses v. Lewis, 5 Exch. Rep. 388; Mellish v. Richardson, 5 Exch. Rep. 404; Townshend v. Duncan, 2 Bland, 49.

 Bac. Abr. tit. Executors and Administrators, B. 2.

 Wankford v. Wankford, 1 Salk. 306; Freeman v. Fairlie, 3 Merv. 39.

 1715, ch. 39, s. 8; Dep. Com. Gu. 55, 57.

 1798, ch. 101, sub ch. 14, s. 2; 1820, ch. 174, s. 3; Wankford v. Wankford, 1 Salk. 306; Sibley v. Williams, 3 G. & J. 52.

 Stanford’s case, Cro. Jac. 61; Jolliffe v. Pitt, 2 Vern. 695; Cary v. Stephenson, 2 Salk. 421; Murray v. The East India Company, 7 Com. Law Rep. 67; Fishwick v. Sewell, 4 H. & J. 394; Haslett v. Glenn, 7 H. & J. 17.

 Bac. Abr. tit. Executors and Administrators, I.

 Blackborough v. Davis, 1 P. Will. 42.

 Browne v. Shore, 1 Show. 2 and 25; Palmer v. Allicock, 2 Show. 407; S. C. 3 Mod. 59; Squib v. Wyn, 1 P. Will. 380; Palmer v. Garrard, Prece. Chan. 21; Doran v. Simpson, 4 Ves. 665.

 Dep. Com. Gu. 114; Edwards v. Freeman, 2 P. Will. 446; 1798, ch. 101, sub eb. 11, s. 14.

 Elibank v. Montolieu, 5 Ves. 742; Conway v. Green, 1 H. & J. 151.

 Webster v. Webster, 10 Ves. 93.

 Boteler v. Allington, 3 Atk. 459; Fishwick v. Sewell, 4 H. & J. 391.

 1719, ch. 14, s. 7.

 Mountford v. Gibson, 4 East. 446.

 Lenox v. Prout, 3 Wheat. 527.

 Brown v. Selwin, Ca. Temp. Tal. 242 ; Hayward v. Carroll, 4 H. & J. 521; Jones v. Slubey, 5 H. & J. 381.

 Ridgeway v. Darwin, 7 Ves. 404 ; Thompson v. Lambe, 7 Ves. 588; Boardman v. Jackson, 2 Ball & B. 385; Beckwith v. Butler, 1 Wash. 224; Paynes v. Coles, 1 Mun. 395.

 Carnan v. Vansant, 1807, M. S.

 Clark v. Van Riemsdyk, 9 Cran. 160; Tong v. Oliver, 1 Bland, 198.

 Beam’s Orders, 28, 179; Hinds v. Dod, Barnard. 258; S. C. 2 Eq. Ca. Abr. 69 ; Paxton’s case, 2 Eq. Ca. Abr. 67; S. C. Sel. Cas. Cha. 53; King v. Marissal, 3 Atk. 192; Radford v. Wilson, 3 Atk. 815; Hepburn v. Durand, 1 Bro. C. C. 503; Deane v. Rastron, 1 Anstr. 64; Prout v. Underwood, 2 Cox, 135; Mountford v. Taylor, 6 Ves. 792 ; White v. Williams, 8 Ves. 193; Somerville v. Mackay, 16 Ves. 382; —v. Harrison, 4 Mad. 252; Wharton v. Wharton, 1 Cond. Cha. Rep. 117.

 2 Mad. Chan. Pra. 339; Salmon v. Clagett, ante 142,

 Brown v. Pittman, Gilb. Eq. Rep. 75; Abergavenny v. Abergavenny, 2 Eq. Ca. Abr. 179.

 Davis v. Davis, 2 Atk. 21; Attorney-General v. Young, 3 Ves. 209; Bishton v. Birch, 1 Ves. & B. 367; Edwards v. McLeary, 2 Ves. & B. 258.

 Attorney-General v. Young, 3 Ves. 209; Seagrave v. Edwards, 3 Ves. 372.

 Jopling v. Stuart, 4 Ves. 619.

 1 Harr. Pra. Cha. 277; Davis v. Davis, 2 Atk. 21; Buckingham v. Peddicord, 2 Bland, 447.

 Plunket v. Penson, 2 Atk. 51; Roche v. Morgell, 2 Scho. & Lefr. 725; Bayley v. Adams, 6 Ves. 594.

 Abergavenny v. Abergavenny, 2 Eq. Ca. Abr. 179; S. C. 1 Harr. Pra. Chan. 277.

 Moore v. Hart, 1 Vern. 114; Story v. Windsor, 2 Atk. 632; Dobson v. Leadbeater, 13 Ves. 233.

 Davis v. Davis, 2 Atk. 21; Poster v. Vassall, 3 Atk. 589; Bayley v. Adams 6 Ves. 594; Dolder v. Huntingfield, 11 Ves. 292.

 Davis v. Davis, 2 Atk. 21; Buckingham v. Peddicord, 2 Bland, 447.

 1 Chitty Plea. 509.

 Matthew v. Hanbury, 2 Vern. 188; Watkyns v. Watkyns, 2 Atk. 96; Clarke v. Periam, 2 Atk. 333, 337; S. C. 9 Mod. 340; Hawkins v. Crook, 2 P. Will. 556; Ward v. Buckingham, 3 Bro. P. C. 581; Clarke v. Turton, 11 Ves. 240; Smith v. Clarke, 12 Ves. 477; Gordon v. Gordon, 3 Swan. 472; Blake v. Marnell, 2 Ball & B. 47.

 5 Geo. 2 c. 25; Davis v. Davis, 2 Atk. 23; 1 Fowl. Exch. Pra. 201.

 Kilty Rep. 189.

 1773, ch. 7, s.S ; 3785, ch. 72, s. 30 and 31; 1787, ch. 30, s. 1; 1790, ch. 38, s. 3; 1792, ch. 41, s. 2 and 4; 1794, ch. 60, s. 2, 3, 5 and 9; 1795, ch. 88, s. 1 and 2; 1797, ch. 114, s. 2 and 3; 1799, ch 79, s. 3 and 4 ; 1804, ch. 107, s. 2; 1820, ch. 161.

 1785, ch. 72, s. 19; 1799, ch. 79, s. 1 and 2; 1820, cl). 161.

 Forum Rom. 36.

 1785, ch. 72, s. 20 ; 1799, ch. 79, s. 2 and 9; 1820, ch. 161, s. 1; Buckingham v. Peddicord, 2 Bland, 447.

 1799, ch. 79, s. 5; 1818, ch. 193, s. 5; Johnson v. Desmineere, 1 Vern. 223; Hawkins v. Crook, 2 P. Will. 556.

 1795, ch. 88, s. 1.

 1 Harri. Pra. Chan. 625; Beam’s Orders, 198; Halsey v. Smyth, Mosely, 186; Venemore v. Venemore, 1 Dick. 93.

 Thompson v. Strode, 2 Hen. & Munf. 19; Legrand v. Francisco, 3 Mun. 83.

 Jopling v. Stuart, 4 Ves. 619 ; Dangerfield v. Claiborne, 2 Hen. & Mun. 17; Thompson v. Strode, 2 Hen. & Mun. 19; Coleman v. Lyne, 4 Rand. 456; Voung v Grundy, 6 Cran. 51.

 Anonymous, 2 P. Will. 87.

 Hopkins v. Stump, 2 H. & J. 304.

 In the case of Warfield v. Gambrill, I G. & J. 510, it has been since laid down by the Court of Appeals, that ‘supposing there is no denial of title in the answer, and that the material allegation in the bill, the seisin of the complainant is unanswered, thi3 is clearly no admission of any unanswered fad.’ Chancellor Hanson, 2 H. & J. 301, says, if any material matter charged in the complainant’s bill, has been neither denied nor admitted by the answers, it stands on the hearing of the cause for nought; and in 6 Crunch, 51, Young v. Grundy, Ch. J. Marshall, in delivering the opinion of the court says, ‘that if the answer neither admits nor denies the allegations of the bill, they must be proved upon the final hearing. Upon a question of dissolution of an injunction, they are to be taken as true.’ ‘A respondent submitting to answer must answer fully, but if the answer he defective, and insufficient to meet the allegations and interrogatories of the bill, the complainant, desiring a fuller response, must except to the answer. If ho do not, he cannot rely on the silence of the respondent in relation to any material allegation, but must prove it.’
Whence it would seem that a new rule has been thus laid down, differing, in some respects, from any spoken of in the text.
On what authority this cited dictum of Chief J ustice Marshall was founded does not distinctly appear from the case as reported in 6 Cranch, 51. It certainly does not entirely accord with any of ilie above mentioned English or Virginia adjudications, and still less with the cotrovorted decision of Chancellor Hanson, as reported in 2 H. &. J. SOI. But as an appeal lies in Virginia from an interlocutory order dissolving an injunction, 5 Rand. S32, it is clear, that the judgment of the court on the principal matter in the case of Young v. Grundy, declaring, that no such appeal would lie in that case, although it came, most probably, from the Virginia section of the District of Columbia, must have been founded on the act of Congress, 24 September, 1789, eh. 20, s. 22, which declares, that appeals shall be allowed only from final decrees and judgments.

 Potter v. Potter, 1 Ves. 274; Amhurst v. King, 1 Cond. Chan. Rep. 407.

 2 Mad. Chan. Pra. 335.

 Drury v. Connor, 6 H. & J. 291.

 Hughes v. Edwards, 9 Wheat. 495.

 Turner v. Bouchell, 3 H. & J. 106.

 Walker v. Burrows, 1 Atk. 93; Brown v. Jones, 1 Atk. 191; Lloyd v. Spillet, 2 Atk. 149; Sculthorp v. Burgess, 1 Ves., jun., 92.

 2 Fonb. Eq. 116, 133; Whalley v. Whatley, 1 Mori. 437.

 Boteler v. Allinglon, 3 Atk. 459; Alden v. Gregory, 2 Eden. 280; Purcell v. McNamara, 14 Ves. 92.

 Nab v. Nab, 10 Mod. 404; Fordyce v. Willis, 3 Bro. C. C. 587.

 Boyd v. McLean, 1 John. C. C. 582.

 Mildmay v. Mildmay, 1 Vern. 53.

 2 Fonb. Eq. 147, 151.

 Powel Mortg. 948; 2 Fonb. Eq. 179.

1) Fearns v. Young, 10 Ves. 184 ; Willis on Trustees, 123, 147; Lewin on Trusts, 452, 456; Jones v. Stockett, 2 Bland, 417.

 Powel Mortg. 956, n.; Balsh v. Hyham, 2 P. Will. 455.

p) Powel Mortg. 956, n.

 Hardy v. Reeves, 4 Ves. 482.

 Ross v. Norvall, 1 Wash. 14.

 Davis v. Simpson, 5 H. &. J. 147; Hepburn v. Sewell, 5 H. & J. 211; Howell v. Baker, 4 John. C. C. 122; Rawlings v. Stewart, 1 Bland, 22, n.; Strike’s case, 1 Bland, 57; Rawlings v. Carroll, 1 Bland, 76, n.; Swan v. Swan, 3 Exch. Rep. 443.

 Tile Kierlighett, 3 Rob. Ad. Rep. 101.

 Moore v. Cable, 1 John. C. C. 385.

 Bressenden v. Decreets, 2 Ca. Cha. 197; East India Company v. Coles, 3 Swan. 142; Eerrers v. Cherry, 1 Eq. Ca. Abr. 4; Lingan v. Henderson, 1 Bland, 236.

 Crapster v. Griffith, 6 H. & J. 144; S. C. 2 Bland, 5.

 Kipp v. Hanna, 2 Bland, 36.

 1826, ch. 159.